NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   MARK SOBEL and
         MARY GRACE SOBEL,  Debtors                    Chapter 11
                                                       Case No.  08-34810 (RTL)


- - - - - - - - - - - - - - - - - - - - - - - - - -X

KAREN GIANNELLI, Chapter 11 Trustee,          Adversary Proceeding
                 Plaintiff,                   Case No. 09-1986 (RTL)
              v.

EMIGRANT MORTGAGE CO., INC.
                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

Appearances
Lawrence W. Luttrell, Esq.
Attorney for Trustee/Plaintiff

Klehr Harrison Harvey Branzburg & Ellers
Carol A. Slocum, Esq.
Attorneys for Defendant


**Raymond T. Lyons, U.S.B.J.**

**OPINION**

I.      **INTRODUCTION**

        In this adversary proceeding, Plaintiff Karen A. Giannelli, Chapter 11 Trustee, alleges

violations of the Truth In Lending Act and the New Jersey Consumer Fraud Act, arising from

three loans made by Defendant Emigrant Mortgage Company to Mark and Mary Grace Sobel,

Debtors in the main bankruptcy case.  Plaintiff seeks damages as well as rescission of the loans

and associated mortgages.

1

Defendant Emigrant Mortgage Company has moved for summary judgment on all counts. Because Plaintiff has failed, as a matter of law, to demonstrate any inaccurate disclosure sufficient to support a Truth in Lending Act violation, summary judgment is granted for Defendant on all claims arising under that statute.  Because Plaintiff has failed, as a matter of law, to demonstrate the sort of unlawful conduct required to make a prima facie case under the New Jersey Consumer Fraud Act, summary judgment is also granted for Defendant on all claims arising under that statute.

## II.   <u>JURISDICTION</u>

The court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code, or arising in or related to a case under Title 11, to the bankruptcy court.

As the requested relief involves voiding Emigrant's mortgage liens, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(K). Furthermore, jurisdiction over the damage claims is likely proper under 28 U.S.C. § 157(b)(2)(B) and (C) because the proof of claim can be viewed as "an action brought by a creditor," and this adversary proceeding "can then be viewed as a recoupement defense to that action." *See Orr v. Ameriquest Mortg. Co. (In re Hollis)*, Adv. No. 07-2615, 2009 Bankr. LEXIS 3020, at *9 (Bankr. D.N.J. Sept. 17, 2009).

## III.   <u>FACTS AND PROCEDURAL HISTORY</u>

Mark and Mary Grace Sobel filed a voluntary petition under chapter 11 of the Bankruptcy Code on December 14, 2008.  Mark Sobel is a medical doctor practicing in New Jersey.  Mary Grace Sobel is an office manager for the practice.  For many years he earned a substantial income of approximately $800,000 per year from his medical practice.  The Sobels

also invested in several pieces of real estate.  As of January 2006 the Sobels' financial statement valued their real estate holdings at nearly $45 million and they claimed a net worth of nearly $23 million.  When they filed bankruptcy in December 2008 they scheduled approximately $32 million in real property and $16 million in liabilities.  They claimed to be solvent by approximately $16 million.  On his bankruptcy schedules Dr. Sobel estimated his net income from practicing medicine at over $600,000 per year.

The impetus for the bankruptcy filing was a foreclosure action in Florida on a Sanibel Island beachfront property where the Sobels conducted a vacation bungalow rental operation. The mortgagee had sought the appointment of a receiver.  The bankruptcy filing stayed that Florida state court proceeding on the eve of the hearing.  Also pending in state court in New Jersey was a foreclosure action by Emigrant Mortgage Company against the Debtors' residence. Default had been entered against the Sobels in the New Jersey foreclosure action and a request for judgment of foreclosure was pending.

Upon motion of the Sanibel Island lender, the bankruptcy court ordered the appointment of a chapter 11 trustee.  Karen A. Giannelli was appointed by the United States Trustee to serve in that role.  She negotiated the transfer of the Sanibel Island property to the secured lender in satisfaction of that claim.  Since then she has attempted to sell the Debtors' New Jersey residence and other real estate without success.

The Sobels acquired their residence, a 12-acre riverfront property, for $13 million in September 2005.  Funding was obtained through a $12 million line of credit from Kennedy Funding, Inc. and Anglo-American Financial, LLC as agents for a number of lenders (hereafter "Kennedy Funding"), as well as an exchange of real estate under § 1031 of the Internal Revenue Code.  The Sobels pledged twelve parcels of real estate in New Jersey, Florida, and New York to

secure the Kennedy Funding loan.  They planned to sell several of their real estate investments to reduce the $12 million Kennedy Funding line of credit and were able to accomplish part of their goal by paying back over $5 million.  The Kennedy Funding loan was scheduled to have a significant increase in the interest rate, from 9% to 18%, on July 1, 2006.  Also, if they failed to repay their line of credit by this date, the Sobels stood to forfeit $90,000 deposited in escrow with Kennedy Funding.

In order to refinance the Kennedy Funding loan, the Sobels hired a mortgage broker at a major international bank and were advised by their certified public accountant and the attorney who had represented them in the acquisition of their residence.  Through the broker and accountant the Sobels applied to Emigrant Mortgage Company for a mortgage loan on their residence to satisfy the Kennedy Funding loan.  They anticipated that the balance due on the Kennedy Funding loan would be less than $5 million before the end of June 2006 through the sale of other properties.  Emigrant agreed to make two loans secured by mortgages on the Sobel residence:  a first mortgage of $3 million and a second mortgage of $2 million.   The Sobels anticipated that they would continue to liquidate other real estate investments and end up with a mortgage to Emigrant of less than $2 million on their residential estate; in fact, they hoped to have no mortgage at all if their liquidation plan was very successful.

Less than two weeks before the scheduled refinancing with Emigrant, the Sobels' attorney wrote to the mortgage broker and advised that closing on two pending sales of the Sobels' real estate was scheduled for June 21 and 22, 2006, but that the closing on a third sale had been delayed until July 2006.  In order to satisfy the Kennedy Funding loan prior to the July 1 deadline, Sobels' attorney asked for a bridge loan of $1.65 million ("Bridge Loan").  He offered as collateral a third lien on the Sobels' residence as well as a first lien on an office

building that was under contract of sale and a second lien on a townhouse in New York City that

the Sobels were about to offer for sale.  The Sobels' attorney assured Emigrant that the proceeds

of these sales could be used to pay down the Bridge Loan immediately. Emigrant agreed.

On June 30, 2006, closing occurred on the three loans from Emigrant to the Sobels: the

$3 million first mortgage and $2 million second mortgage on their residence, and the $1.65

million Bridge Loan secured by the residence, the office building and the New York townhouse.

The Sobels requested immediate disbursement of the loan proceeds before expiration of the

three-day rescission period, claiming a hardship due to the impending July 1 interest rate

increase and escrow forfeiture on the Kennedy Funding loan. Emigrant gave disclosure

statements under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667f, on each of the

loans.  An attorney for Emigrant attended the closing and a fee of $4,000 for that attorney was

disclosed on the closing statement for the $3 million first mortgage and paid from the loan

proceeds.  That fee was not included in the prepaid finance charges disclosed on the TILA form.

Following the closing the Sobels sold their New York City townhouse and used the

proceeds to reduce the Emigrant Bridge Loan by approximately $1 million; however, the sale of

the office building did not occur.  The Sobels made timely monthly payments on the Emigrant

mortgage loans until they defaulted in April 2007.  Emigrant filed a foreclosure complaint

regarding the Bridge Loan on August 22, 2007.[1]  The Sobels failed to answer and default was

entered against them in state court on November 16, 2007.  Emigrant submitted pleadings to the

state court for entry of a final judgment of foreclosure on the Bridge Loan, but the proceeding

was stayed by the Sobels' bankruptcy filing.  On November 21, 2008, a year after default had

---

[1] Though Plaintiff suggests that this foreclosure sought relief on all 3 of the loans, the complaint
clearly requests relief only as to the balance due on the Bridge Loan.

been entered against them in the state court, the Sobels sent a letter to Emigrant cancelling their mortgages.

The Chapter 11 trustee initiated an adversary proceeding in bankruptcy court alleging violations of TILA and the New Jersey Consumer Fraud Act (CFA), N.J. STAT. §§ 56:8-1 et seq. The court set an initial discovery deadline of April 30, 2010. That deadline was extended to July 31, 2010, and then to September 30, 2010. When Plaintiff failed to respond to discovery, Emigrant moved to compel, and Plaintiff was ordered to provide answers to interrogatories by October 10, 2010. In response to Emigrant's question for the factual basis of alleged incorrect or unreasonable closing costs, Plaintiff responded:

> It is contended that all of the items comprising the closing costs paid in connection with the closing on the mortgages with the Defendant were unreasonable in that the Defendant should have never given the mortgage loan in the first place. Furthermore, at least the following closing cost was unreasonable because the Defendant failed to disclose said cost as a finance charge on the Truth in Lending Disclosure Statement:
>
> > $4,000 for Lender's Attorneys Fees to (Law Firm), Line 1107 of the Settlement Statement on the $3,000,000 mortgage to Defendant.

No other facts were alleged by Plaintiff to constitute violations of TILA.

Emigrant moves for summary judgment. Attached to its moving papers were the transcript of Dr. Sobel's deposition, Plaintiff's answers to interrogatories that were sworn to by Dr. Sobel, and numerous closing documents related to the acquisition of the Sobel residence, the Kennedy Funding loan and the three Emigrant loans. Plaintiff filed a brief in opposition to the motion but did not provide any additional factual support for her position, other than a counter-statement of facts and a certification by counsel that contained more legal argument than admissible evidence.

## IV.    <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c)(2).[2]  As the Supreme Court has indicated, "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation and citation omitted). "In deciding a motion for summary judgment, the judge's function is . . . to determine if there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993).

"The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact . . . ."  *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 323).  In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 n.2 (1986) (reiterating the "doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment").  An issue is material when it "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. An issue is genuine when it is "triable," meaning that reasonable minds could disagree on the result.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (no genuine issue where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party").

---

[2] Rule citations refer to the Federal Rules of Civil Procedure in effect on November 16, 2010, when the instant motion was filed.  Thus, they do not reflect amendments that became effective on December 1, 2010, before the motion was argued.  However, the outcome of the motion would not change if the amended rules were used.

Typically, the moving party "must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).  However, where, as here, the moving party will not bear the burden of persuasion at trial, this requirement is relaxed somewhat; in such cases, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the [trial] court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325 (majority opinion); *see also Larkin v. Super Fresh Food Mkts., Inc.*, 291 Fed. App'x 483, 484 (3d Cir. 2008) ("Summary judgment is appropriate where 'the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'").  That is, where the moving party will not bear the burden of persuasion, that party need not "negate the opponent's claim;" rather, "summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Celotex Corp.*, 477 U.S. at 323-24.

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  A party may not defeat a motion for summary judgment unless it sets forth specific facts establishing the existence of a genuine issue of material fact for trial. FED. R. CIV. P. 56(e) (providing that in response to a summary judgment motion "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial").  *See also Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982); *Olympic Junior, Inc. v.*

*David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972). If the non-moving party's evidence is a

mere scintilla or is not "significantly probative," the court may grant summary judgment.

*Liberty Lobby, Inc.*, 477 U.S. at 249-52. The non-movant will prevail only if the evidence

produced is of "sufficient quantum and quality" to allow a rational and fair-minded fact finder to

return a verdict in his favor, bearing in mind the applicable standard of proof that would apply at

trial on the merits. *See id.* at 254.

In this case, the only relevant evidence was attached to Emigrant's moving papers,

including the closing documents, a transcript of Dr. Sobel's deposition, and Plaintiff's answers to

interrogatories as sworn to by Dr. Sobel. Plaintiff offered no additional admissible evidence by

affidavit or otherwise. There is no factual dispute.

## V.    DISCUSSION

### a.  TILA Claims

TILA is a comprehensive consumer protection statute that is associated with a set of

implementing regulations known as Regulation Z. *Seldon v. Home Loan Servs.*, 647 F. Supp. 2d

451, 459 (E.D. Pa. 2009). Together, these rules require creditors to provide certain disclosures,

including the annual percentage rate of interest, the finance charge, the amount financed, the

total of payments, and the payment schedule. 15 U.S.C. §§ 1631, 1638(a)(2), (3), (4), (5), (6); 12

C.F.R. §§ 226.17, 226.18(b), (d), (g), (h); *see also Seldon*, 647 F. Supp. 2d at 459. TILA further

allows for actual and statutory damages. 15 U.S.C. § 1640(a); *see also Drennan v. PNC Bank,*

*NA (In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*),

622 F.3d 275, 283 n.9 (3d Cir. 2010).

TILA further provides consumers with a right to rescind a transaction in which a security interest is granted in the consumer's principal dwelling. 15 U.S.C. § 1635; 12 C.F.R. § 226.23(a)(1).  This right is available

> until midnight of the third business day following consummation, delivery of [notice of the right to rescind], or delivery of all *material disclosures*, whichever occurs last.  If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first.

12 C.F.R. § 226.23(a)(3) (emphasis added).  Material disclosures include disclosures of the annual percentage rate of interest, the finance charge, the amount financed, the total of payments, and the payment schedule.  12 C.F.R. § 226.23 n.48.  "Because the purpose of the TILA is to assure meaningful disclosures, 'the issuer must not only disclose the required terms, it must do so accurately.'"  *Seldon*, 647 F. Supp. 2d at 460 (quoting *Roberts v. Fleet Bank (R.I.)*, 342 F.3d 260, 266 (3d Cir. 2003)).

Here, Plaintiff's claims relate to inaccuracies in required disclosures.  At best, Plaintiff's evidence supports allegations of no more than $4,000[3] worth of discrepancies, limited to the finance charge disclosures associated with the $3 million loan.  These allegations raise the following questions:

1. Whether Plaintiff's claims regarding the other types of disclosures can survive summary judgment;

2. Whether the alleged inaccuracies apply to all three of the Emigrant loans, or some subset of them;

---

[3] Plaintiff's opposition cites an additional discrepancy of $75.50 as an additional undisclosed finance charge.  Once the attorneys' fee charges are disposed of as excludable in the following discussion, this $75.50 is insufficient to meet the tolerance threshold outlined below.  Thus, this additional allegation would likely not change the outcome of the present matter.  However, because Plaintiff failed to disclose this additional basis for her claim in response to interrogatories, any claim based on the $75.50 is untimely raised and is not here decided.

3.  Whether the alleged inaccuracies exceeded the applicable tolerances; and

4.  Whether the charges attributed to the $4,000 were improperly excluded from the
finance charge.

**i)      Disclosures Alleged to be Inaccurate**

Plaintiff's complaint alleges inaccuracies in each of four types of disclosures (finance charge, the amount financed, the total of payments, and the payment schedule), but her opposition papers rely exclusively on an understatement of finance charges for the $4,000 lender's attorney fee.  As discussed above, Plaintiff's discovery responses were also limited to the finance charge disclosure.  As to the disclosures on total payments and payment schedule, Plaintiff has failed to aver or identify any evidence to create an issue of fact or to justify a trial. Thus, as to these two types of TILA claims, summary judgment is granted in favor of Emigrant.

In contrast, the amount financed is calculated by subtracting any prepaid finance charge from the principal loan amount.  *See* 12 C.F.R. § 226.18(b).  Accordingly, any inaccuracy in the finance charge would lead to an inaccuracy in the amount financed.  Thus, if Plaintiff's claims regarding disclosure of the finance charge are sufficient to survive summary judgment, then so are her claims regarding disclosure of the amount financed.  While the remainder of the TILA discussion is directed at finance charge disclosures, the amount financed disclosure is subject to an identical analysis and outcome.

**ii)  Loans to Which Alleged Disclosure Inaccuracies Apply**

Plaintiff claims disclosure inaccuracies that involve only the $3 million loan.  However, Plaintiff argues that the three loans were effectively one loan, and that they should be treated as such.  That is, Plaintiff argues that if the alleged inaccuracies constitute actionable TILA violations, then Plaintiff may seek relief as to all three loans.

11

However, the record is clear that at least the Bridge Loan was intended as a separate loan. As outlined above, it was intended to provide temporary financing while Debtors sold off certain other properties, and it was to be paid down quickly.  Furthermore, Debtors provided additional collateral to secure only this loan.  This is important in determining whether the special tolerance for loans in foreclosure applies to the alleged inaccuracies in this case, as discussed below.

As to the other two loans, the outcome of the present matter is unaffected by any determination of whether or not they should be treated in aggregate or individually.  Thus, the remainder of this discussion will assume, without deciding, that the other two loans may be treated as one loan.

### iii) **Tolerance Analysis**

#### (1) **Rescission – General Tolerance**

In transactions secured by real property or a dwelling, "the disclosed finance charge and other disclosures affected by the disclosed finance charge (including the amount financed . . .) shall be treated as accurate if the amount disclosed as the finance charge . . . is understated by no more than $ 100 . . . ."  12 C.F.R. § 226.18(d); *see also* 15 U.S.C § 1605(f)(1).

For rescission purposes, however, TILA provides for a tolerance that is the greater of $100 or 0.5% of the face amount of the loan, under 12 C.F.R. § 226.23(g)(1) and 15 U.S.C. § 1605(f)(2)(A).  As to the $3 million loan, 0.5% is $15,000; as to the $2 million loan, 0.5% is $10,000; as to the $1.65 million Bridge Loan, 0.5% is $8,250.  Thus, Plaintiff's identified discrepancies of $4,000 would normally be insufficient[4] to exceed the statutory rescission

---

[4] Under Third Circuit case law, it is the plaintiff's burden to demonstrate that alleged inaccuracies exceed the statutory tolerance.  *See Sterten v. Option One Mortg. Corp. (In re Sterten)*, 546 F.3d 278, 286 (3d Cir. 2008) (holding that 15 U.S.C. § 1605 is not an affirmative defense).

tolerance for any of the loans, let alone the $3 million loan associated with the putatively

inaccurate disclosures.

### (2) <u>Rescission – Special Foreclosure Tolerance</u>

However, Plaintiff argues that, under 12 C.F.R. § 226.23(h)(2) and 15 U.S.C.

§ 1635(i)(2), the proper rescission tolerance is $35 because Emigrant initiated foreclosure

proceedings.   Plaintiff argues that the foreclosure proceedings affected the rescission tolerance

for all three loans because the complaint in the foreclosure action specifically cited the other

loans secured by the Debtors' residence and because the loans should be treated as a unit.

In support of her argument that the special foreclosure tolerance of $35 applies in this

case, Plaintiff's brief states, "[Emigrant's] request for final judgment in the foreclosure included

a claim for the purported amount due on all three mortgages."  At oral argument the court

requested documentary support for that statement.  Plaintiff provided one pleading in which

Emigrant mentioned all three loans.  The court has reviewed all of the documents submitted to

the state court in connection with the request for final judgment of foreclosure and finds that the

statement in Plaintiff's brief is inaccurate.  From the foreclosure complaint to the affidavit of

proof it is clear that Emigrant sought to foreclose only on the Bridge Loan and not on the first or

second mortgages.  Specifically, the foreclosure complaint limited its request for relief to fix the

balance due on the Bridge Loan, foreclose the Sobels' equity of redemption, and order a sheriff's

sale to satisfy the Bridge Loan.  Furthermore, Emigrant's other filings in that case (including the

certification of amount due, as well as the proposed judgment and writ of execution) were also

limited to the Bridge Loan debt.  Thus, the foreclosure was clearly limited to that loan.  Further,

as discussed above, the Bridge Loan is clearly separate from the other two loans.

Thus, the $35 rescission tolerance is applicable only to the Bridge Loan. Yet, as discussed above, the putatively inaccurate finance charge is limited to the $3 million first mortgage. Even if Plaintiff's allegations are supported by evidence and taken as true, there was no discrepancy in the disclosure relating to the Bridge Loan, and the $4,000 discrepancy alleged with respect to the $3 million loan is not sufficient to exceed the standard 0.5% statutory threshold – whether calculated as to that loan individually or in aggregate with the $2 million loan. Plaintiff has failed to create a genuine issue of fact as to inaccuracies in the finance charge disclosures, at least for the purposes of rescission. Accordingly, Emigrant is entitled to judgment as a matter of law and is granted summary judgment with respect to the rescission claim.

### (3) **Damages – Standard Tolerance**

As to the damages claim, however, the normal $100 tolerance applies to the damages claim. *See Sterten v. Option One Mortg. Corp. (In re Sterten)*, 546 F.3d 278, 283 (3d Cir. 2008) (reading 15 U.S.C. § 1605(f) as creating a separate tolerance for damage claims than for rescission claims). Thus, further analysis is required as to whether the putative discrepancies were in fact improperly excluded.

### iv) **Excludability of the Omitted Charges**

The parties agree that the $4,000 discrepancy cited by Plaintiff is attributable to attorneys' fees. Thus, the sole remaining question is whether the $4,000 in attorneys' fees was properly excluded.

Under 15 U.S.C. § 1605(e)(2) and 12 C.F.R. § 226.4(c)(7), the finance charge may exclude certain bona fide and reasonable fees in a transaction secured by real property or in a residential mortgage transaction; such fees include "fees for preparing loan-related documents,

such as deeds, mortgages, and reconveyance or settlement documents." 12 C.F.R.

§ 226.4(c)(7)(ii).  Additionally,

> If a lump sum charged for several services includes a charge that is not
> excludable, a portion of the total should be allocated to that service and included
> in the finance charge.  However, *a lump sum charged for conducting or attending
> a closing (for example, by a lawyer or a title company) is excluded from the
> finance charge if the charge is primarily for [excludable] services* related to items
> listed in § 226.4(c)(7) (for example, reviewing or completing documents), even if
> other incidental services such as explaining various documents or disbursing
> funds for the parties are performed.  The entire charge is excluded even if a fee
> for the incidental services would be a finance charge if it were imposed
> separately.

12 C.F.R. § 226, Supp. I, Official Staff Interpretations, § 226.4(c)(7) (emphasis added); *see also*

*Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) ("Unless demonstrably irrational,

Federal Reserve Board staff opinions construing [TILA] or Regulation [Z] should be dispositive

. . . .").  Here, the $4,000 lump-sum lender's attorneys' fees were not included in the finance

charge.

It is Plaintiff's burden to identify a non-excludable service included in the charge,

sufficient to prove that it was not primarily for excludable services.  *See Inge v. Rock Fin. Corp.*,

281 F.3d 613, 625 (6th Cir. 2002) ("If, as Plaintiff alleges, the service was not primarily for an

activity excludable from the finance charge under § 226.4(c)(7), then it would place a minuscule

burden on Plaintiff to allege what non-excludable service Defendant required the [third party] to

perform.").  Alternatively, Plaintiff could demonstrate improper exclusion of the attorneys' fees

by showing that they were not bona fide and reasonable.  However, Plaintiff would bear the

burden of proof on this issue as well – courts in the Third Circuit have required that, in order to

survive a motion to dismiss, TILA plaintiffs must provide factual support for claims regarding

reasonableness of otherwise excludable fees.  *E.g.*, *Payan v. Greenpoint Mortg. Funding*, 681 F.

Supp. 2d 564, 570 (D.N.J. 2010) (dismissing TILA claims where plaintiffs failed "to state with

requisite specificity . . . why certain charges and fees are not bona fide and are unreasonable in

amount"); *Seldon v. Home Loan Servs.*, 647 F. Supp. 2d 451, 461 (E.D. Pa. 2009) (dismissing

TILA disclosure claim based on unreasonable fees where plaintiffs provided "no allegation

whatsoever as to how any of these fees qualify as unreasonable or non-bona fide").  These

decisions necessarily imply a rule that TILA plaintiffs bear the burden of proving

unreasonableness of fees.

An examination of Plaintiff's brief in opposition to the motion for summary judgment

demonstrates the absence of admissible evidence to satisfy Plaintiff's burden of proving a TILA

violation.  Plaintiff's brief states:

> It is not in dispute that the Defendant required the Debtors to incur a
> charge of $4,000.00 for the lender's attorneys fees and that said fees were not
> disclosed to the Debtors on the TIL under the Amount Financed. . . .  The
> Defendant's law firm prepared no deed as the transaction was a refinance.  There
> is also no evidence that their attorney prepared any of the closing documents.  The
> settlement statement was prepared by the Debtors' attorney and the loan
> documents came from the Defendant as they likely do with all of their residential
> real estate closings. … While it is possible, that the Defendant's law firm could
> have plausibly prepared a closing document, it cannot be said that charging the
> borrowers $4,000.00 for the preparation of such document is reasonable. … The
> Defendant's attorney did not conduct the closing.  The Debtors' attorney did.  Nor
> is there any evidence that the Defendant's attorney attended the closing.
> However, even if their attorney had, it would be unreasonable to charge $4,000.00
> to simply attend the closing.

The assertion, "Nor is there any evidence that the Defendant's attorney attended the closing" was

revealed to be false.  Dr. Sobel testified at his deposition that Emigrant's attorney attended the

closing.  Other factual assertions have no basis in the record.  For example, the statement that

"the loan documents came from the Defendant as they likely do with all their residential real

estate closings" is not supported by any evidence.  As Plaintiff admits, "There is also no

evidence that their attorney prepared any of the closing documents."  That is because Plaintiff

has not produced any such evidence despite having the burden of proof.  Plaintiff herself admits

16

that, because the documents came from Emigrant, it is possible that Emigrant's attorneys

prepared them; absent any proof to the contrary, this plausible conclusion is what the law

requires the court to assume.

The essence of Plaintiff's argument is that $4,000 is not a reasonable charge for whatever

the lender's attorney did.  The problem is that Plaintiff bears the burden of demonstrating

unreasonability, yet she has presented no evidence of what the attorney did or what would be a

reasonable charge for those legal services.  Plaintiff asks the court to conclude that $4,000 must

have been unreasonable but gives the court no basis other than *ipse dixit* to do so.  The court is

not willing to make that leap to a conclusion.

Plaintiff has failed to produce any factual support for her allegations that the fees were

unreasonable or that they were not excludable from the finance charge under 12 C.F.R.

§ 226.4(c)(7).  She cannot meet her burden of proof.

### v)  **TILA Claims - Conclusion**

Thus, Plaintiff's TILA claims regarding the finance charge disclosure, both for rescission

and damages, fail because Plaintiff has no evidence that the $4,000 lender's attorneys' fees were

unreasonable or not properly excluded from the finance charge.  Further, even if they were

improperly excluded, the discrepancies do not rise to the level of actionable inaccuracies for

TILA rescission purposes.  For these reasons, Emigrant is granted summary judgment on all

TILA claims.

### b)  **CFA Claims**

Under N.J. STAT. § 56:8-2,

> The act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false promise,
> misrepresentation, or the knowing, concealment, suppression, or omission of any
> material fact with intent that others rely upon such concealment, suppression or

omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

Also, "[l]oans are included in the definition of 'advertisement,' and the definition of 'merchandise,' has been held to include 'the offering, sale, or provision of consumer credit.' *Assocs. Home Equity Servs., Inc. v. Troup*, 778 A.2d 529, 543 (N.J. Super. Ct. App. Div. 2001) (citing *Lemelledo v. Beneficial Mgmt. Corp.*, 696 A.2d 546 (N.J. 1997); N.J. Stat. § 56:8-1(a), (c)).

To state a prima facie case under the CFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *Prof'l Cleaning & Innovative Bldg. Servs. v. Kennedy Funding, Inc.*, 245 Fed. App'x 161, 165 (3d Cir. 2007); *Payan v. Greenpoint Mortg. Funding*, 681 F. Supp. 2d 564, 573 (D.N.J. 2010); *Dabush v. Mercedes-Benz USA, LLC*, 874 A.2d 1110, 1115 (N.J. Super. Ct. App. Div. 2005); *New Jersey Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003).

### i)  Unconscionability

As to the first element, Plaintiff alleges that Emigrant's actions in the challenged transactions amounted to unlawful conduct because they were unconscionable predatory lending practices.  "New Jersey defines the term 'unconscionable business practice' [by using] 'the standard of conduct contemplating good faith, honesty in fact and observance of fair dealing.'" *Hassler v. Sovereign Bank*, 374 Fed. App'x 341, 344 (3d Cir. 2010) (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 429 (N.J. 1995)).

Unconscionability typically requires some sort of heightened reprehensibility. For example, to constitute consumer fraud, "the business practice in question must be misleading and stand outside the norm of reasonable business practice in that it will victimize the average consumer." *Id.* (internal quotations and citations omitted); *Dabush v. Mercedes-Benz USA, LLC*, 874 A.2d 1110, 1116 (N.J. Super. Ct. App. Div. 2005). Similarly, the New Jersey Supreme Court has held that "'unconscionability must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like, which are stamped unlawful under N.J.S.A. 56:8-2.'" *Flower Corp. v. Myung Soon Park*, No. 03-4868 (WGB), 2005 U.S. Dist. LEXIS 38247, at *16 (D.N.J. Nov. 22, 2005) (quoting *Kugler v. Romain*, 279 A.2d 640 (N.J. 1971)). As another example, in the context of claims based in breach of warranty claims under New Jersey law, the Third Circuit has held that, to allege a prima facie claim of an unconscionable business practice, a plaintiff must allege "substantial aggravating circumstances." *Viking Yacht Co. v. Composite One LLC*, 385 Fed. App'x 195, 202 (3d Cir. 2010).

To support its contention that predatory lending can constitute an unconscionable business practice that is unlawful under the CFA, Plaintiff cites cases involving loans to unsophisticated investors. One involved a foreclosure rescue loan to an 83-year-old woman who did not have any professional assistance when entering the transaction. *Nowosleska v. Steele*, 946 A.2d 1097 (N.J. Super. Ct. App. Div. 2008) (involving a motion to set aside default judgment, rather than an affirmative determination of unconscionability). The other involved reverse-redlining, where unsophisticated and unrepresented minority debtors were exploited by lenders. *Assocs. Home Equity Servs., Inc. v. Troup*, 778 A.2d 529 (N.J. Super. Ct. App. Div. 2001).

In *Troup*, the court provided an excellent explanation of the boundaries and contours of

unconscionability doctrine.

> The word "unconscionable" must be interpreted liberally so as to effectuate the
> public purpose of the CFA. It is not intended to "erase the doctrine of freedom of
> contract, but to make realistic the assumption of the law that *the agreement has
> resulted from real bargaining between parties who had freedom of choice and
> understanding and ability to negotiate in a meaningful fashion*." The standard of
> conduct contemplated by the unconscionability clause is "good faith, honesty in
> fact and observance of fair dealing[,]" and the need for application of that
> standard "is most acute when the professional seller is seeking the trade of those
> most subject to exploitation-the uneducated, the inexperienced and the people of
> low incomes."

*Id*. at 543 (quoting *Kugler v. Romain*, 279 A.2d 640 (N.J. 1971)) (emphasis added).

That case also endorsed a useful explanation of what types of lending practices can be

described as predatory or unconscionable.

> In using the term "predatory lending" I refer to lenders who target certain
> populations for onerous credit terms. The population generally targeted includes,
> among others, the elderly, minorities, and residents of neighborhoods that do not
> have *ready access to mainstream credit*. Credit terms not warranted by the
> objective facts regarding the creditworthiness of these individuals are imposed
> upon them because for various reasons the lenders feel they can take advantage of
> a borrower. Typically predatory lenders take advantage of borrowers due to their
> *lack of sophistication* in the lending market, due to their *lack of perceived options
> for the loan* based on discrimination or some other factor, or due to deceptive
> practices engaged in by the lender that mislead or fail to inform the borrower of
> the real terms and conditions of the loan.

*Id*. at 537.

Here, Plaintiff alleges that Emigrant knew that Debtors could not afford to make

payments on the loans at issue. Plaintiff alleges that Emigrant was on notice of this fact due to

the income statements provided by Debtors. Plaintiff alleges that Emigrant only entered into the

loans because of the substantial equity in the collateral, and that it did so with the intent of

stripping this equity when Debtors failed to pay.

Yet Plaintiff has presented no evidence of this intent, and the record shows that the

Bridge Loan was to be paid soon after closing, from sales of the Debtors' other properties,

resulting in a substantial decrease in payments, sufficient to make them affordable.  Indeed, this

perceived equity-stripping scheme appears to be little more than a figment of Plaintiff's

attorney's overactive imagination, set loose by his failure to identify any colorable claims.

Plaintiff also alleges that Emigrant's mortgages were in reality a worse deal for Debtors

than their previous mortgage from Kennedy Funding.  Plaintiff argues that the 18% interest rate,

set to take effect on July 1, 2006, was unenforceable under New Jersey law.  This argument is

misdirected, and it ignores the reality that the Sobels sought out Emigrant to refinance their

mortgage, and that they actively sought to avoid forfeiture of their $90,000 escrow deposit, all

while represented by professional attorneys, accountants, and mortgage brokers.  Under these

circumstances, Emigrant had no duty to inquire as to the Sobels' motivations or to independently

ensure that the mortgage transaction represented the best financial option then available to them.

Furthermore, even taking Plaintiff's remaining contentions as true, they are insufficient to

support a rational fact-finder's conclusion that Emigrant's actions  rose to the level of

unconscionability.[5]  Debtors here are clearly distinguishable from the borrowers in *Troup* and

*Nowaleska*, *supra*.  Debtors had the advice and representation of attorneys, a mortgage broker,

and an accountant throughout the process of negotiating the loans.  Further, they were not the

type of unsophisticated borrowers with a dearth of lending options, real or perceived.  Rather,

they were sophisticated real estate owners holding millions of dollars worth of real estate in New

---

[5] Worth noting, the Third Circuit has recently stated, "Whether a practice itself is unfair is a classic jury question."  *Hassler v. Sovereign Bank*, 374 Fed. App'x 341, 344 (3d Cir. 2010). However, the Third Circuit has in other cases made this determination as a matter of law.  *E.g.*, *Kane v. U-Haul Int'l, Inc*., 218 Fed. App'x 163 (3d Cir. 2007); *Green v. Am. Online (AOL)*, 318 F.3d 465 (3d Cir. 2003); *In re Van Holt*, 163 F.3d 161 (3d Cir. 1998).

Jersey, New York, and Florida, purchased through a series of complex financial transactions. Plaintiffs have failed to show or even suggest that the loans were not the result of "real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." *Kugler v. Romain*, 279 A.2d 640 (N.J. 1971).

Thus, Debtors have failed to create a genuine issue of fact as to unconscionability – the only theory on which they propose to demonstrate the first, and necessary, element of their CFA claim. Accordingly, discussion of the other CFA elements is unnecessary, and summary judgment on the CFA claim is granted in favor of Emigrant.

## VI.   <u>CONCLUSION</u>

Because Plaintiff has failed to demonstrate any inaccuracies in Emigrant's disclosures, and because Plaintiff has failed to demonstrate any unlawful or unconscionable conduct by Emigrant, summary judgment is granted on all counts.

Dated:  January 25, 2011                    /s/ *RAYMOND T. LYONS, U.S.B.J.*